May it please the Court, Your Honors. Barry Schultz on behalf of the Plaintiff Debbie Stage. In this case, the Administrative Law Judge's decision to find that Ms. Stage could stand and walk for six hours throughout a workday, lifting and carrying 20 pounds for up to one-third of the workday, is not supported by substantial evidence. In addition, the ALJ's credibility determination is based on multiple unreasonable inferences and therefore the credibility determination should be reversed by this Court. The ALJ found that despite Ms. Stage's moderately severe osteoarthritis in the left hip, requiring hip replacement surgery, in addition to her lumbosacral degenerative disc disease and obesity, that she could nevertheless stand and walk for six hours out of an eight-hour workday. The only evidence in the record that could support that decision is the opinion of the state agency doctor, Dr. Corcoran. The difficulty with the ALJ relying on Dr. Corcoran's opinion is that Dr. Corcoran was unaware of the fact, because the examination took place much later, that an orthopedic surgeon, Dr. Oney, had examined Ms. Stage, had taken x-rays, and he, for the first time, determined that the claimant had suffered from what's leg to appear shorter than the right leg, and also that she walked with an antalgic gait, favoring that left leg, and that she actually required hip replacement surgery. The ALJ should have either sent Dr. Oney's opinion to Dr. Corcoran or one of the other state agency doctors, or called upon a medical expert to testify as to the significance of Dr. Oney's findings. This is a case where there is an opinion that's contrary to the ALJ's decision, and that's Dr. Rivera, the claimant's primary care physician. We didn't, we didn't, did not, the plaintiff did not raise a treating physician argument in this case, because the ALJ gave some reasons for rejecting Dr. Rivera's opinion, but Dr. Rivera's opinion is the only opinion of record given following the evaluation by the orthopedic surgeon, and Dr. Oney's evaluation is the only evaluation by an orthopedic surgeon in this case. In the Campbell versus Astru case, this court reversed ALJ's decision in part because the ALJ relied on the state agency opinion, yet significant evidence had come into the record following that opinion. And then in Goins versus Colvin, which we cite in our brief, at page 680, the court, this court stated, quote, fatally the administrative law judge failed to submit that MRI to medical scrutiny, as she should have done since it was new and potentially decisive medical evidence, close quote. Plaintiff believes that same type of argument reasoning should govern in Ms. Stage's case, because the opinion by Dr. Oney, or the evidence by Dr. Oney, could be potentially decisive, for if Ms. Stage was limited to sedentary work, unable to stand and walk for six out of eight hours a day, she would be disabled based on the medical vocational guidelines, as well as the testimony of the vocational expert in this case. Mr. Schultz, if I recall correctly, the plaintiff did not get the epidural treatment that had been recommended, or have the hip replacement surgery. Is there any indication in the record as to why, or anything that you could add? There's no indication that I saw as to why she decided not to have surgery at that time. She had indicated to one of her doctors that she had other conditions that were not helpful, and she did not want to undergo that again. That was the only recognition of that. And if I recall correctly, the government is relying to some extent, as the ALJ did, on plaintiffs shopping for groceries for hours at a time. Is it correct that her testimony was she does that only with a motorized cart? That's correct. Either with a motorized cart, or she leaves her grandchildren, or she adopted them, her children to shop while she would sit up up front. And that, she didn't testify to the shopping for hours. That was in a form, and she said she went shopping twice a month, you know, for hours. Reasonable inference, as reasonable as anything, is that it took her so long to shop because it was very hard for her to get around. She didn't, there was no indication that she was on her feet for hours while she was doing that. And if I could ask you one other record-related question here. I thought at some point she was working full-time and had $9,000 in earnings in a year. Is that right? Well, that's partially correct. I mean, she testified at page 40 of the record that her job was technically a full-time job. It was in a restaurant tavern, but that her employer allowed her to come in whenever she could. And she might work a come in two or three days a week because she was already experiencing back pain at that, significant back pain at that time. So her earnings reflected the amount she actually worked while she called it a full-time job because technically she should have been working, if she could have. So she could have worked, she could work as much as she wanted to. Correct. That was the testimony, and I believe that's uncontradicted in the record. Indicated the ALJ relied on or reached numerous unreasonable inferences based in finding the plaintiff not credible. The ALJ at page 21 of the record noted that the claimant lives alone and cares for her two teenage daughters without outside assistance. First, that is incorrect because Ms. Stage testified that her sister comes in to help take care of the housework. What she actually said was her granddaughter and her sister do almost all of the housework. The dusting, the only thing Ms. Stage did was cook occasionally very simple things, microwave, soup, things like that. And she did the dishes, but she had to sit while doing the dishes. So she did get outside assistance, and that maybe isn't the most important thing because her teenagers were able to help her out doing the physical activity in the house. The ALJ then remarked that the claimant told Dr. Oney that before she could schedule surgery, she needed to make arrangements for the care of her children. And the ALJ inferred from that that Ms. Stage was there for engaging in more activity caring for her children than she indicated. That's not a reasonable inference that these were young teenagers, I think 13 or 14 or 14 and 15 at that time, that Ms. Stage didn't wanna leave them alone at home while she was at the hospital having surgery is not a thing that she testified to. Similarly, there's the question of the full time work. The ALJ relied on that as an inconsistency, but as I indicated, Ms. Stage explained that fully in the decision that it wasn't really a full time job, but she could have worked full time if she was physically capable of that. And finally, we have several other examples in the brief, but the ALJ said that the plaintiff reported that she used a back brace that was prescribed, but there's no mention in the record of it. In fact, at the consultative examination, Ms. Stage was wearing the brace and the doctor noted it, so the ALJ is wrong on his fact. But in addition, that's not a proper basis for finding Ms. Stage not credible. The ALJ never asked her to produce the prescription. There would be no reason for her to, if the ALJ never questioned the veracity of her testimony. And of course, back braces don't require a prescription. A doctor could say, I think a back brace might help you, to Ms. Stage with an eighth grade education. That may be the event the doctor prescribed it. There might not have actually been a written prescription, but if the ALJ wanted to see it, he should have inquired of her. Thank you, Your Honors. Thank you, Mr. Schultz. Ms. O'Kelley. May it please the Court. This case hinges largely on plaintiff's credibility. The ALJ provided many reasons for finding her testimony not fully credible. While plaintiff nitpicks some of those reasons, perfection is not required. One of plaintiff's primary complaints and reasons for applying for benefits was back pain. The ALJ noted that imaging studies of her back remained the same from 2007, well before her alleged onset in October of 2009, to 2011, well after her alleged onset. The ALJ did not myopically focus on this back evidence, but rather fairly considered it as weighing against plaintiff's allegations that her condition had worsened. The ALJ further noted that for her purportedly disabling back pain and hip pain for a full year after she alleged she became disabled. That is not to say that plaintiff did not receive any medical treatment. This is not a case where the ALJ holds against the claimant failure to seek treatment or failure to seek emergency services. Rather, the ALJ plaintiff sought out medical treatment. She sought out emergency services, but for a full year while receiving this treatment, she never mentioned this purportedly disabling pain. The ALJ reasonably held that fact as weighing against her credibility. In application materials, plaintiff reported that she had prescribed a back brace. But as the ALJ noted, there was no mention of a back brace in the medical record. In argument just now, plaintiff criticized the ALJ's statement, noting that she had, in fact, presented to the consultative examination wearing the brace. The ALJ certainly could have been more precise in his statement in stating that the back brace appeared nowhere in the medical treatment record rather than the medical record generally. Even if the ALJ's imprecision were an error, it is harmless. The ALJ's reasoning remains sound. There was no prescription for a back brace in the record. It was never mentioned in treatment records. Ms. O'Callaghan, I'm trying to understand how somebody who's ready for a hip replacement can do light work. Yes, Your Honor. And if I may finish the thought about the back brace quickly, I will get to that. So plaintiff fails to explain how presenting to a consultative examination wearing a back brace where there's no mention of a back brace anywhere in any of the treatment records actually bolsters her credibility when the purpose of the consultative examination is to establish disability. Now let's turn to the hip replacement. Plaintiff makes much of the fact that Dr. Oney recommended hip replacement surgery, mentioning this fact no less than 21 times in her initial brief, 12 times in the reply brief. She wants this court to place great emphasis on this recommendation as evidence of the severity of her condition, and she wants this court to presume that a recommendation would have profound functional limitations. Yet she also wants this court to pay little attention that she chose to forego this surgery. The ALJ found plaintiff's decision to forego the surgery weighed against her allegations. Plaintiff argues that the ALJ was required to ask why she chose to forego the surgery. There's nothing in the rulings or regulations that requires the ALJ to ask for an explanation. Rather, the ALJ should consider any explanation that is provided and may look to other information in the record to assess why the claimant chose to forego treatment. The ALJ did just that. The ALJ cited Dr. Oney's seven-page treatment record to support his statement that plaintiff decided not to pursue surgery. In the treatment record, plaintiff said she had to make arrangements for her children and that she would call when she was ready for surgery. The record also reflected a follow-up conversation in January of 2011, where plaintiff said that she had not scheduled surgery and that she was holding off. Plaintiff gave reasoning to Dr. Oney. She said that she needed to arrange for child care and that she wanted to hold off. The ALJ did not need to re-question her to see if she had new reasons for not pursuing surgery. The ALJ considered the evidence and considered her explanation. Moreover, the ALJ, in accordance with Social Security Ruling 96-7P, considered other information in the case record. The ALJ looked to what happened after Dr. Oney recommended hip replacement. Namely, her decision to seek care from her family practice physician, Dr. Rivera, the type of care she received, and the physical examination findings following Dr. Oney's recommendation. Plaintiff also discussed her daily activities and that the ALJ's consideration of her daily activities is weighing against her credibility. Even if the ALJ erred in considering her daily activities as she testified to those activities and as she described them in application materials, the ALJ nonetheless made a very valid point that she had told treatment providers that she had no difficulties with her activities of daily living. The ALJ reasonably found plaintiff's contemporaneous report to treatment providers weighed against her allegations of more profound limitations. Could you address the grocery shopping? And I meant to encapsulate the grocery shopping in that. To the extent that plaintiff testified to using a motorized cart, to taking hours to perform shopping, she never mentioned those difficulties to her contemporaneous treatment providers. When asked if she had difficulties with daily living, she said none. And it's reasonable to expect... If the question is, in essence, can you take care of your grocery shopping, the Right. I mean, I... And that's... But given a pretty serious hip problem where she manages to do her grocery shopping with a motorized cart, that's well and good. We can easily imagine maybe she could do some sedentary work with a sit-stand option under those kinds of circumstances. But light work, six hours a week, that's... I have a tough time with that. Yes, Your Honor. And we're not required to accept plaintiff's subjective statements of her functional limitations. I would imagine that someone who presents for treatment would express difficulties of the nature plaintiff mentioned. So it was reasonable for the ALJ to at least consider as one of the factors that she did not complain. Now let's turn to the hip replacement again and what evidence followed it. Plaintiff wants and characterizes Dr. Oney's suggestion for hip replacement as a marked deviation from earlier records. If it were, in fact, a marked deviation from the prior records, one would expect that to be borne out by physical examination findings, by the type of care she received, by the recommendations given by her treatment providers. And that's precisely what the ALJ looked to. He looked to what happened afterwards. The ALJ noted that just one month after Dr. Oney recommended hip replacement, plaintiff on musculoskeletal examination had no pain on inspection. She had a normal range of motion, she had normal extremities. The ALJ recognized that following Dr. Oney's recommendation, there were some examination abnormalities. She experienced some tenderness, pain, and some reduction in range of motion. But nonetheless, her physician continued to recommend that plaintiff remain active, that she engage in regular cardiovascular exercise, and that she engage in normal activities as tolerated. Here, like this the ALJ competently grappled with competing evidence and provided a legitimate reason for favoring some evidence over others. One of the other issues addressed by plaintiff, may I continue, or do you have any questions? I see that my time has expired. We ask that ALJ's decision be Mr. Schultz. Plaintiff is not asking the court to presume anything about someone needing a hip replacement, but that the ALJ should not have presumed that that did not change anything concerning the plaintiff's ability, and that's why the ALJ should have had Dr. Oney's opinion and examination results reviewed by a ALJ could have a competent opinion as to whether or not, in fact, plaintiff could stand and walk for six hours a day. The daily activities in this case don't support a negative credibility finding. The plaintiff engaged in almost no activities, and there's very little in the record indicating, there's really nothing other than that statement about the grocery shopping that is inconsistent with the plaintiff's testimony that she did almost no physical activities at home or outside of the home. She didn't even attend her children's school activities because of the condition she was in. And finally, while the back imaging remained the same, the hip imaging clearly didn't. Clearly for the first time with Dr. Oney examined her, there was an opinion of severe arthritis or moderately severe arthritis with this fixed flexion deformity. That evidence was not considered by anybody. Thank you, Your Honor. Thanks both counsel. Case is taken under advisement.